1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE ANDRES ROBLES
PORTILLA,

        Petitioner,

  v.

DAVID HOLBROOK, Warden,

        Respondent

Case No. 2:22-cv-05892-KES

MEMORANDUM OPINION AND
ORDER

     In August 2022, Jose Andres Robles Portilla ("Petitioner") filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging the sufficiency of the evidence to support his state court conviction for forcible sodomy. (Dkt. 1 ["Petition"].)  For the reasons explained below, the Court DENIES the Petition.

## I.

## FACTUAL BACKGROUND.

     The underlying, italicized facts are taken from the unpublished California Court of Appeal decision: People v. Portilla, No. B304075, 2021 Cal. App. Unpub. LEXIS 3182, 2021 WL 1958769 (Cal. Ct. App. May 17, 2021).  (Lodged Document ("LD") 5.)  These facts may be presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Tilcock v. Budge, 538 F.3d

1138, 1141 (9th Cir. 2008).  Because Petitioner challenges the sufficiency of the
evidence, this Court has also conducted an independent review of the record.  See
Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

*Appellant and Y.P. became friends while working together at a restaurant. Their relationship eventually became sexual. Y.P. recalled telling appellant that she did not perform oral or anal sex.*

*On the night of December 29, 2018, Y.P. and appellant had alcoholic drinks with friends at two local bars.  Later, at Y.P.'s apartment, she and appellant listened to music and drank beer in her bedroom.  After a time, they went outside and smoked a cigarette before reentering the bedroom. Y.P. suggested they go to the sofa bed in the living room because the bedroom had bunkbeds.*

*Appellant sat on the sofa bed and Y.P. stood in front of him.  The two of them started kissing.  Before they became intimate, Y.P. told appellant she was on the last day of her menstrual period. Appellant said it was okay.  They removed their clothes.  Y.P. positioned herself on hands and knees on the sofa bed.  Appellant knelt behind her and stroked his penis.  After rubbing it against her buttocks, appellant inserted his penis into her vagina.  After a couple of thrusts, appellant removed his penis.  Appellant then placed his penis on Y.P.'s anus and attempted penetration.  As soon as Y.P. "felt the pressure," she said, "What are you doing?" and told appellant twice to stop.  When appellant did not stop, Y.P. fell forward on her chest.  Appellant was still on his knees.*

*Y.P. twisted her body, attempting to turn over, but appellant was on top of her. [FN#2: Y.P. was five feet two inches tall and weighed 130 pounds.  Appellant was approximately six feet tall and weighed 200 pounds.]  Y.P. tried to push herself up and told appellant to get off her, but he did not respond.  Appellant grabbed Y.P. by the shoulders, spread her legs with his knees, and pulled her toward him as he forced his penis about half-way into her anus.  Y.P. was crying in pain and kept telling him to stop.  But the more she told him to stop, the more appellant*

2

1  *penetrated her anus.  Y.P. continued to cry and clutched the blanket, as appellant*

2  *sodomized her about five times.  By that point, Y.P. had become silent, just wanting*

3  *it to be over.*

4         *Appellant stopped and got off Y.P.  She went into the bedroom, wrapped*

5  *herself in a towel, lay on her bed, and cried.  Appellant entered the bedroom, fully*

6  *dressed, and apologized.  Y.P. told him to leave her home.  Appellant, again,*

7  *apologized.  Y.P. said she never wanted to see appellant again and repeatedly*

8  *demanded that he leave.  Appellant told her, "I'm sorry. I'm dumb. I know what I*

9  *did."  Y.P. said, "You know you just raped me."  Appellant responded, "Yes, I*

10  *know," and said he was going "to call the cops."  Appellant called 911 and*

11  *reported he "had raped somebody."[FN#3: The audio recording of the 911 call*

12  *was played for the jury and a transcript was provided.]*

13         *Police officers arrived and found appellant pacing in the carport of the*

14  *apartment building.  He appeared to be nervous.  Appellant acknowledged he had*

15  *called the police because he and Y.P. had sexual intercourse and she was crying*

16  *afterward.  Appellant said he felt bad.  The officers spoke to Y.P., who appeared to*

17  *be in shock.  She told them appellant had raped her.*

18         *Later, during a police interview, appellant admitted Y. report that he had*

19  *"anal sex with her against her will," "forcing against her will," was*

20  *"true."[FN#4: The audio recording of this interview was played for the jury and a*

21  *transcript was provided.]  Appellant further stated, "I decided to put it [his penis]*

22  *in her butt."*

23         *A sexual assault examination revealed Y.P. sustained multiple lacerations in*

24  *her anus consistent with blunt force trauma.  She experienced pain in her anus for*

25  *about a week.*

26         *Appellant testified in his defense that he and Y.P. had engaged in consensual*

27  *vaginal intercourse that night, during which she moaned but did not say anything*

28

1    *else.  At some point when they were having sex, Y.P. dropped to her chest and*

2    *appellant fell on top of her.  She began to cry and appellant stopped having*

3    *intercourse.  Y.P. then left for the bedroom.  Appellant got dressed and went into*

4    *the bedroom to ask why Y.P. was crying. Y.P. accused him of "basically raping"*

5    *her by penetrating her anus.  Appellant repeatedly denied it and decided to call the*

6    *police because he was being accused of something he knew was wrong.*

7    *Appellant denied he had previously discussed anal sex with Y.P. or engaged*

8    *in anal sex with her that night; they had vaginal intercourse.  Appellant also*

9    *testified he told the 911 operator and a police officer that he had committed rape*

10    *and sodomy because that is what he had been accused of by Y.P.*

11    (LD 5 at 3-6.[1])

12                                 **III.**

13                         **PROCEDURAL HISTORY**

14           In 2019, a Los Angeles County jury convicted Petitioner of forcibly

15    sodomizing Y.P.  (1 CT 133.)  Petitioner appealed.  (LD 3, 4.)  In May 2021, the

16    California Court of Appeal affirmed the conviction.  (LD 5.)  In August 2021, the

17    California Supreme Court denied his petition for review.  (LD 7.)  He did not file

18    any state habeas petitions.  (Dkt 1 at 3.)

19           In August 2022, Petitioner filed the Petition, asserting two grounds for relief.

20    (Dkt. 1.)  Respondent moved to strike Ground One as unexhausted.  (Dkt. 11.)

21    After the Court struck Ground One, Respondent answered Ground Two.  (Dkt. 23,

22    30.)  The Court extended Petitioner's deadline to reply (Dkt. 31), but Petitioner

23    failed to reply.

24

25

26   _____

27           [1] Except for the Clerk's Transcript ("CT") and Reporter's Transcript ("RT"),
     page citations refer to pagination imposed by the Court's e-filing system.

28

1

**IV.**

2

**ASSERTED GROUND FOR RELIEF**

3      <u>Ground Two</u>:  Petitioner alleges that his sodomy conviction "is not supported

4  by substantial evidence."  (Dkt. 1 at 5.)  He contends there was insufficient

5  evidence to prove beyond a reasonable doubt that he (1) intentionally penetrated

6  Y.P. anally and (2) realized Y.P. had withdrawn consent.[2]  (<u>Id.</u> at 5-6.)

7

**V.**

8

**STANDARD OF REVIEW**

9      Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

10  Petitioner is entitled to habeas relief only if the state court's decision on the merits

11  "(1) resulted in a decision that was contrary to, or involved an unreasonable

12  application of, clearly established Federal law, as determined by the Supreme

13  Court" or "(2) resulted in a decision that was based on an unreasonable

14  determination of the facts in light of the evidence presented in the State court

15  proceeding." 28 U.S.C. § 2254(d); <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

16      The relevant "clearly established Federal law" consists of only Supreme

17  Court holdings (not <u>dicta</u>), applied in the same context that petitioner seeks to apply

18  it to, existing at the time of the relevant state court decision.  <u>Premo v. Moore</u>, 562

19  U.S. 115, 127 (2011).

20  _____

21      [2] Under the heading "The Conviction for Sodomy Is Not Supported by
Substantial Evidence," Petitioner's state appellate briefs only discuss the evidence
22  relevant to whether he realized Y.P. had withdrawn consent.  (LD 3 at 25; LD 6 at
26.)  But, elsewhere in those briefs, he mentions his testimony that he "never
23  thought … that he had entered her anus" while having sex with her.  (LD 3 at 14;
LD 6 at 14.)  These issues are related because Y.P. testified that she withdrew her
24  consent when she felt anal penetration.  (2 RT 366.)  The California Court of
Appeal addressed Ground Two as an overall challenge to the sufficiency of the
25  evidence.  (LD 5 at 10.)  Respondent did not challenge Ground Two as partially
26  unexhausted.  (Dkt. 30 at 6.)  The Court, therefore, will construe Petitioner's state
court briefs as exhausting both aspects of Ground Two.
27

28

1    A state court acts "contrary to" clearly established Federal law if it applies a

2    rule contradicting the relevant holdings or reaches a different conclusion on

3    materially indistinguishable facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  A

4    state court "unreasonably appli[es]" clearly established federal law if it engages in

5    an "objectively unreasonable" application to the facts of the correct governing legal

6    rule.  White v. Woodall, 572 U.S. 415, 425-28 (2014) (rejecting previous

7    construction of section 2254(d) that a state court decision involves an unreasonable

8    application of clearly established Supreme Court law if the state court

9    "unreasonably refuses to extend a legal principle to a new context where it should

10   apply").  Habeas relief may not issue unless "there is no possibility fair-minded

11   jurists could disagree that the state court's decision conflicts with [the United States

12   Supreme Court's] precedents."  Harrington v. Richter, 562 U.S. 86, 103 (2011).

13   "[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 357-58

14   (2013), as even a "strong case for relief does not mean the state court's contrary

15   conclusion was unreasonable," Richter, 562 U.S. at 102.

16   The relevant state court decision is the last reasoned decision.  Ylst v.

17   Nunnemaker, 501 U.S. 797, 806 (1991).  The federal court "looks through"

18   subsequent unexplained decisions, presuming that those decisions denied relief on

19   the same grounds as the last reasoned decision.  Id. at 804.  Accordingly, this Court

20   applies AEPDA deference to the California Court of Appeal's decision on direct

21   appeal.  (LD 5.)

22

23

24

25

26

27

28

**VI.**

**DISCUSSION**

**A.    Relevant Appellate Proceedings.**

After reciting the elements of the crime of forcible sodomy and the standard of appellate review, the California Court of Appeal found, "Sufficient evidence supported the sodomy conviction, particularly as it relates to the element of consent." (LD 5 at 13.)  The appellate court further explained:

> The evidence is uncontroverted that Y.P. never consented to engage in sodomy.  Y.P. testified to having previously told [Petitioner] that she did not perform anal sex.  On the night of the incident, Y.P. demanded repeatedly that [Petitioner] stop penetrating her anus, attempted to turn her body to push him off her, and cried out in pain.  Y.P.'s testimony, the blunt force trauma she suffered, and [Petitioner's] admissions constituted ample evidence she was sodomized against her will and by force.

(Id.)

**B.    Clearly Established Federal Law.**

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970); accord Juan H. v Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Evidence is enough to support a conviction if, viewing it in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the reviewing court does not ask whether the evidence at trial established guilt beyond a reasonable doubt as to every essential element of a crime but instead asks whether any rational trier of fact could

1    have so found.  Id.  The court must construe the evidence in the light most

2    favorable to the prosecution to "respect the province of the jury to determine the

3    credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

4    inferences from proven facts."  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.

5    1995).  Jury decisions are unreasonable under Jackson only when the jury's

6    findings are "so insupportable as to fall below the threshold of bare rationality."

7    Coleman v. Johnson, 566 U.S. 650, 656 (2012).

8         When a state court has issued a reasoned decision rejecting an insufficiency

9    of the evidence claim under a standard "not contrary" to Jackson, the reviewing

10   court owes "double deference" to the trier of fact and state court.  Juan H., 408 F.3d

11   at 1275; Long v. Johnson, 736 F.3d 891, 897 (9th Cir. 2013).

12        Here, the California Court of Appeal applied California precedents consistent

13   with Jackson.  (LD 5 at 12.)  Therefore, the question on federal habeas review is

14   whether the California Court of Appeal unreasonably applied Jackson.  Juan H.,

15   408 F.3d at 1275.  Reversal is only proper if the state court's decision was

16   objectively unreasonable.  Coleman, 566 U.S. at 655.

17   **C.    Petitioner Is Not Entitled to Habeas Relief.**

18        **1.    Evidence of Intentional Sodomy.**

19        The evidence of Petitioner's intent to anally penetrate Y.P. included

20   circumstances described by Y.P. and Petitioner's own statements to police.  Y.P.

21   testified, "It seemed like he liked [anally penetrating me].  Like, every time I kept

22   telling him to stop, like, it hurts, stop, it seemed like he was doing it more, putting

23   his penis inside my anal."  (2 RT 372.)  In a police interview after the assault,

24   Petitioner acknowledged he had made an intentional decision by saying, "I decided

25   to put it in her butt."  (CT 83.)  Medical evidence that Y.P.'s anus had been torn by

26   the assault (3 RT 610) corroborates that forcible anal penetration occurred.

27        The California Court of Appeal reasonably found this evidence sufficient to

28

1   prove that Petitioner intentionally anally penetrated Y.P.  Petitioner testified that he
2   never intended to anally penetrate Y.P. and that he did not remember doing so.  (3
3   RT 931, 960).  But, the jury could disbelieve that testimony and had a good reason
4   to do so, since it contradicted his statement to the police.  See Wright v. West, 505
5   U.S. 277, 296 (1992) (noting that "the jury was entitled to disbelieve" the
6   defendant's testimony and, upon doing so, could consider his dishonesty evidence
7   of guilt).  Y.P.'s testimony also provides circumstantial evidence of Petitioner's
8   intent to penetrate her anally.  Her testimony shows that, even if Petitioner did not
9   initially intend to anally penetrate Y.P., he formed the intent to continue doing so
10  post-penetration, despite her protests.

11          **2.      Evidence of Petitioner's Awareness Y.P. Withdrew Consent.**

12          Y.P. testified that she withdrew consent and communicated that to Petitioner.
13  Specifically, she testified that after feeling anal penetration, she repeatedly told
14  Petitioner to stop.  (2 RT 366-67, 371, 379.)  She started to cry.  (Id. at 371, 373-
15  74.)  She tried to push him off her.  (Id. at 378.)  She testified that he ignored her
16  pleas over the course of fifteen minutes.  (Id. at 380.)

17          Petitioner also confessed to raping Y.P.  The State introduced into evidence a
18  tape of a 911 call Petitioner made right after the assault.  The first part of that
19  transcript states:

20          [Operator]: 911, what is your emergency?
21          [Petitioner]: I just raped a girl.
22          [Operator]: You raped a girl?
23          [Petitioner]: Yeah.
24  (CT 77.)

25          At trial, Petitioner attempted to explain away his confession, testifying as
26  follows:

27          [Defense Counsel]: Okay.  Now, you heard a tape of the 911 call, your
28

9

1    voice, stating: I had raped, you know, I raped somebody.  Do you

2    remember that?

3    [Petitioner]: Yes.

4    [Defense Counsel]: Yeah.  And you just testified that you—you're

5    denying that you raped her.  But then on the phone call you said that,

6    you know, I raped a girl, you know.  Why did you say that?

7    [Petitioner]: That's what she told me I had done.

8    (3 RT 938-39.)

9        Again, the jury was entitled to disbelieve Petitioner's testimony and consider

10   his dishonesty further evidence of his guilt.  The jury was entitled to credit Y.P's

11   testimony.

12                                         **VII.**

13                                     **CONCLUSION**

14       For the reasons stated above, the California Court of Appeal reasonably

15   found the evidence sufficient to support Petitioner's conviction for forcible

16   sodomy.  The Court, therefore, DENIES the Petition.

17

18   Date: <u>March 23, 2023</u>

19                                                   *Karen E. Scott*

20                                             _____

21                                             KAREN E. SCOTT

22                                             United States Magistrate Judge

23

24

25

26

27

28